IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | CRIMINAL ACTION NO. |
| | : | 1:11-CR-259-WBH-CCH |
| ANTHONY MICHAEL SANTOS | : | |
| ARAVIUS HILL | : | |

## **ORDER FOR SERVICE OF REPORT AND RECOMMENDATION**

Attached is the Report and Recommendation of the United States Magistrate Judge in this action in accordance with 28 U.S.C. § 636(b)(1) and this Court's Criminal Local Rules 12.1(E) and 58.1(A)(3).

Pursuant to 28 U.S.C. § 636(b)(1), each party may file written objections to the Report and Recommendation within **fourteen (14) days** of service of this Order. Should objections be filed, they shall specify with particularity the alleged error(s) made (including reference by page number to the transcript if applicable) and shall be served upon the opposing party. *See United States v. Gaddy*, 894 F.2d 1307, 1315 (11th Cir. 1990). The party filing objections will be responsible for obtaining and filing the transcript of any evidentiary hearing for review by the District Court. Failure to object in accordance with this rule waives a party's right to review. FED. R. CRIM. P. 59(b)(2).

Pursuant to 18 U.S.C. § 3161(h)(1)(H), **the above-referenced fourteen (14) days allowed for filing objections are EXCLUDED from the computation of time under the Speedy Trial Act ("the Act"), whether or not objections are actually filed.** If objections are filed, the Clerk is **DIRECTED** to **EXCLUDE** from the computation of time all time between the filing of the Report and Recommendation, and the submission to the District Judge, along with any objections, responses and replies thereto. 18 U.S.C. § 3161(h)(1)(D), (H); *Henderson v. United States*, 476 U.S. 321, 331 (1986); *United States v. Mers*, 701 F.2d 1321, 1337 (11th Cir. 1983). The Clerk is **DIRECTED** to submit the Report and Recommendation with objections, if any, to the District Court after expiration of the above time period.

IT IS SO ORDERED this 24th day of April, 2012.

_____
C. CHRISTOPHER HAGY
UNITED STATES MAGISTRATE JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA     :
     :
     v.     :  CRIMINAL ACTION NO.
     :  1:11-CR-259-WBH-CCH
ANTHONY MICHAEL SANTOS     :
ARAVIUS HILL     :


## REPORT AND RECOMMENDATION


Defendants Anthony Michael Santos and Aravius Hill are charged in the indictment with one count of conspiring to possess with the intent to distribute marijuana, a controlled substance, in violation of 21 U.S.C. § 846 and 18 U.S.C. § 2; one count of possessing with the intent to distribute marijuana, a controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(D) and 18 U.S.C. § 2, and one count of possessing a firearm during and in relation to a drug trafficking crime, in violation of 18 U.S.C. §§ 924(c)(1)(A) and 2.

This action is now before the Court on the "Motion to Suppress the April 27, 2011 Warrantless Search and Seizure" filed by Defendant Hill [40] and the "Motion to Suppress the April 27, 2011 Warrantless Search and Seizure" filed by Defendant Santos [48] (collectively the "Motions to Suppress Evidence"), the "Motion to Suppress Statements" filed by Defendant Hill [72] and the "Motion to Suppress

Statements" filed by Defendant Santos [77] (collectively the "Motions to Suppress Statements"), and the "Consent Motion to Extend Deadline for Filing Post Hearing Briefs" [76] filed by Defendant Santos.

The Court held an evidentiary hearing on Defendants' Motions to Suppress Evidence on November 22, 2011, and a transcript of the hearing [67] was filed on December 29, 2011. Thereafter, Defendant Hill filed a post-hearing brief in support of his Motion to Suppress Evidence and Motion to Suppress Statements [73] on January 27, 2012, and Defendant Santos filed a post-hearing brief in support of his Motion to Suppress Evidence and Motion to Suppress Statements [78] on February 21, 2012. The Government filed a consolidated response brief [83] on March 20, 2012. Although Defendant Hill filed a reply brief [85] on April 3, 2012, Defendant Santos did not file a reply brief. Accordingly, the Motions to Suppress Evidence and Motions to Suppress Statements were submitted to the Court for resolution on April 4, 2012.

Having heard the evidence and having reviewed the transcript of the evidentiary hearing and the briefs of the parties, the undersigned **RECOMMENDS** that the Motion to Suppress Evidence filed by Defendant Hill [40] and the Motion to Suppress Evidence filed by Defendant Santos [48] be **DENIED**. The undersigned further

**RECOMMENDS** that the Motion to Suppress Statements filed by Defendant Hill [72], and the Motion to Suppress Statements filed by Defendant Santos [77] be **GRANTED**.

In addition, the Consent Motion to Extend Deadline for Filing Post Hearing Briefs [76] filed by Defendant Santos is **GRANTED** as unopposed.

## FINDINGS OF FACT

1.  Officer Jason Uhler is a police officer with the Atlanta Police Department who was performing patrol duties on April 27, 2011. *See* Transcript of November 22, 2011 Hearing ("T.") at 69, 72-73.

2.  On April 27, 2011, while he was performing his patrol duties, Officer Uhler received a call asking him to meet Investigator Paige at the Shell gas station located at 535 Lee Street, at the corner of Oak and Lee Street. T. at 72-73, 107-08, 150-51.

3.  Officer Uhler was told to observe a silver Ford F-150 pickup truck for possible traffic violations. T. at 49, 77, 117.

4.    Officer Uhler was in his patrol car at the Southeast corner of the Shell station and observed the silver Ford F-150 pickup truck approaching on Lee Street towards the Church's Chicken parking lot across the street. T. at 73-74, 77.

5.    Officer Uhler observed that the vehicle had an improper window tint and also observed that the vehicle did not use a turn signal when turning right into the parking lot. T. at 80-82.

6.    Because Officer Uhler knew that the improper tint and the failure to use a turn signal were traffic violations, he activated his blue lights and drove into the Church's Chicken parking lot behind the Ford pickup truck. T. at 81, 85-88.

7.    After pulling into the parking lot behind the pickup truck, Officer Uhler engaged his siren to alert the driver of the truck that he was behind him. T. at 90.

8.    The pickup truck continued to travel around the Church's Chicken building and it eventually backed into a parking spot, at which time Officer Uhler parked in front of the truck so that it could not pull out of the parking space. T. at 53, 85-90, 130.

9. As Officer Uhler exited his vehicle and approached the truck, the driver of the truck stepped out and Officer Uhler told the driver to get back into the vehicle. T. at 94.

10. Officer Uhler smelled a faint odor of marijuana coming from the truck. T. at 21-22, 94-96, 105.

11. Officer Uhler told the driver of the truck, who was Defendant Hill, that he needed Hill's driver's license, insurance card, and car keys. T. at 94-95.

12. Officer Uhler returned to his patrol car with Hill's driver's license, insurance card, and car keys, and a few minutes later officers Thomas Atzvert, Christian Malstrom, and Kareem Khoury arrived on the scene. T. at 12-13, 95.

13. Officer Uhler told the other officers that he had detected the odor of marijuana in the truck and explained to them why he had made the traffic stop. T. at 97-98.

14. Officers Atzert and Khoury also detected the odor of marijuana coming from the truck from a distance of one or two feet away. T. at 21-22, 98, 158.

15. Officers Atzert and Uhler walked to the driver's side of the truck and told the Hill that he was being detained because the inside of his vehicle smelled like marijuana. T. at 21-22, 97-98.

16. Officer Atzert asked Hill if there were any narcotics or weapons in the truck, and Hill responded that there were not. T. at 15-17.

17. Officer Atzert then asked Hill for permission to search the truck, and Hill responded that "he did not mind." T. at 17, 107.

18. No weapons were drawn on Hill when he gave his consent to the officers to search the truck, and Hill never withdrew or limited his consent to search. T. at 23, 107.

19. Officer Uhler then took Hill out of the truck and put handcuffs on him, and placed him in the back seat of Officer Atzert's patrol vehicle. T. at 98-99.

20. Officer Khoury then took the passenger out of the truck, who was Defendant Santos, placed Santos in handcuffs, and placed him in the back seat of Officer Khoury's patrol vehicle. T. at 159, 170-71.

21. Officer Khoury did not tell Santos that he was under arrest at that time. T. at 159.

22. At some point when the Defendants were being removed from the truck and placed inside the patrol cars, one of the officers called for a K-9 unit to conduct a search of the truck, but Officer Uhler does not remember who made the call. T. at 100.

23. Officer Atzert conducted the initial search of the pickup truck, and detected a strong scent of marijuana. T. at 24-25, 59.

24. Officer Atzert discovered an empty brown duffel bag in the back seat of the truck, and detected the very strong odor of marijuana coming from the bag. T. at 25-26.

25. Officer Atzert discovered small green leafy flakes inside the duffel bag, which he knew from his training and experience were remnants of marijuana. T. at 26.

26. Officer Atzert went to talk to Hill about the contents of the bag, and Hill said the bag belonged to Santos. T. at 26-27.

27. Officer Atzert then asked Santos about the bag and whether it contained marijuana; Santos admitted that it was his bag and said there may have been marijuana in it previously, but there wasn't any inside the bag now. T. at 26-27.

28. At the time that Defendants made the statements about the duffel bag, they had not received any *Miranda* warnings. T. at 26-27, 55, 147.

29. Officer Atzert did not return the bag to the vehicle at that time, and placed the bag by his patrol car. T. at 28-29.

30. Officer Richard Sperl is a certified narcotics detection K-9 handler who has worked with the Atlanta Police Department for 12 years, during which time he has performed several hundred K-9 searches of vehicles. T. at 177-78.

31. Officer Sperl's partner is Arna, an eight-year-old female German Shepherd, who alerts to the presence of narcotics by scratching with her front paws. T. at 178-179.

32. Arna is trained to detect marijuana, powder cocaine, crack cocaine, methamphetamine, heroin, and ecstacy. T. at 178.

33.   Officer Sperl's search log indicates that he was called to the scene at the Church's Chicken parking lot on April 27, 2011, at approximately 4:12 p.m., and he estimated that he and Arna arrived at the scene and began the search of the truck at approximately 4:30 p.m. T. at 183-87.

34.   When Officer Sperl arrived at the scene, he introduced himself to Hill and explained that he was going to walk Arna around the exterior of the vehicle and that she was trained to detect narcotics. T. at 180.

35.   Officer Sperl and Arna conducted an open-air sniff of the truck, beginning with the passenger side and went in a counterclockwise pattern. T. at 181-83.

36.   Sometime after Officer Atzert questioned Defendants about the duffel bag that emitted a strong odor of marijuana, but before Arna began her open-air sniff, the duffel bag had been returned to the back seat of the truck.[1] *See* T. at 28-29, 182.

---

[1] Officer Atzert testified that he kept the duffel bag out of the truck during the K-9 sniff because he did not want the dog alerting on the bag. T. at 29. Officer Sperl's nearly contemporaneous report indicated the bag had been placed back in the truck sometime before Arna began her open-air sniff. T. at 189-90. The undersigned credits this account and finds that, regardless of Officer Atzert's intent, at some point before the K-9 open-air sniff, the duffel bag had been returned to the back seat of the truck.

37.     When Arna reached the driver's side door, she alerted by scratching on the door seam. T. at 181.

38.     After Arna alerted on the driver's side door, Officer Sperl opened the door of the truck and let Arna inside it. T. at 29, 182.

39.     When Arna entered the inside of the truck, she showed "immediate interest" in a duffel bag that was in the back seat of the vehicle. T. at 182.

40.     Officer Sperl determined that the bag was empty, and then removed the bag from the vehicle. T. at 182.

41.     After the bag was removed from the vehicle, Arna went to the front passenger side of the vehicle and alerted at the base of the center console unit on the passenger side by scratching with her front paws. T. at 182.

42.     After Arna alerted to the center console, Officer Sperl removed her from the truck and informed the other officers that she had alerted there. T. at 30.

43.     Officer Atzert then entered the truck, got on the floorboard of the passenger side, reached one of the panels under the console, and it "popped off" to reveal

a thick heat-sealed vacuum bag that contained a green substance that appeared to be marijuana. T. at 30.

44. Officer Atzert then pulled that bag out and flashed his flashlight into the cavity inside the inner dashboard, and discovered two more bags that did not appear to be vacuum sealed. T. at 31.

45. All three bags that were discovered beneath the front console appeared to contain a "high grade of marijuana," according to Officer Atzert. T. at 31.

46. When Officer Atzert was searching on the passenger side of the truck, Officer Khoury was searching the driver's side of the console, and after he "popped" the panel off, he discovered a loaded silver and black Taurus .40 caliber handgun, an extra magazine, and a glass pickle jar with a black sock rolled over it. T. at 32, 163-64, 168.

47. Officer Khoury removed the black sock from the pickle jar and discovered green clumps that appeared to be marijuana. T. at 164.

48.     Officer Atzert estimated that, from the time he arrived on the scene to the time Arna alerted to narcotics in the console, no more than 15 to 20 minutes had passed. T. at 58-59.

## DISCUSSION

**I.     Motion to Extend Deadline**

On February 17, 2012, Defendant Santos filed a Consent Motion to Extend Deadline for Filing Post Hearing Briefs [76], in which he requested permission from the Court to file a post-hearing brief on February 21, 2012. Although Defendant Santos styled the motion as a "Consent Motion," he did not state that the Government consented to the extension. Nevertheless, the docket reflects that the Government did not file any response or otherwise indicate any opposition to the motion. Thereafter, Defendant Santos filed a post-hearing brief in support of his Motion to Suppress Evidence and Motion to Suppress Statements [78] on February 21, 2012.

Accordingly, the Consent Motion to Extend Deadline for Filing Post Hearing Briefs [76] filed by Defendant Santos is **GRANTED** as unopposed, and Defendant's brief filed on February 21, 2012, will be considered as timely filed.

## II.    Motions to Suppress Evidence

Defendants have both filed Motions to Suppress Evidence [40][48]. They argue that the evidence obtained as a result of the K-9 search must be suppressed because the warrantless search was conducted illegally and without probable cause.

### A.    *The Initial Stop of the Vehicle Was Lawful*

As the Supreme Court has held, "[a] person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer, by means of physical force or show of authority, terminates or restrains his freedom of movement." *Brendlin v. California*, 127 S. Ct. 2400, 2405 (2007) (internal quotes omitted) (*quoting Florida v. Bostick*, 501 U.S. 429, 434 (1991) (*quoting Terry v. Ohio*, 392 U.S. 1, 19, n.16 (1968))).  Nevertheless, while Defendants may have been subjected to a seizure under the Fourth Amendment, it does not mean that the seizure was unlawful because the Fourth Amendment only prohibits "unreasonable searches and seizures."  U.S. Const. amend. IV.

The Supreme Court has held that a brief detention of a person may be justified if the Government can establish that the police officers had a reasonable suspicion based on articulable facts that such person may have engaged in illegal activity. *Terry*

*v. Ohio*, 392 U.S. 1, 21 (1968); *see also United States v. Diaz-Lizaraza*, 981 F.2d 1216, 1220-21 (11th Cir. 1993); *United States v. Williams*, 876 F.2d 1521, 1523 (11th Cir. 1989). A "reasonable suspicion" requires "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [an] intrusion." *Terry*, 392 U.S. at 21. Reasonable suspicion can be based on the "totality of the circumstances" and law enforcement personnel may draw on their experience and training to make inferences and deductions about the likelihood of criminal activity. *United States v. Arvizu*, 534 U.S. 266, 273-74 (2002); *United States v. Sokolow*, 490 U.S. 1, 7-8 (1989).

For their own personal safety, police officers may draw their weapons and handcuff suspects during a *Terry* stop without necessarily transforming the stop into a *de facto* arrest requiring probable cause. *See United States v. Diaz-Lizaraza*, 981 F.2d 1216, 1220-21 (11th Cir. 1993); *United States v. Kapperman*, 764 F.2d 786, 791 n.4 (11th Cir. 1985). Patting a suspect down for weapons and asking him to identify himself is "a reasonable, and not overly intrusive, way to investigate [the police officer's] suspicion of criminal activity." *Diaz-Lizaraza*, 981 F.2d at 1221; *see also United States v. Bonds*, 829 F.2d 1072, 1074 (11th Cir. 1987) (independent of any justification to search for evidence of criminal activity, a law enforcement officer has

a right to conduct a limited search for weapons when he has a reasonable belief that he is in danger).

Thus, the Court must determine whether the detention of Defendants was so prolonged that it ripened from a lawful *Terry* stop into a *de facto* arrest, which would require probable cause. *See United States v. Acosta*, 363 F.3d 1141, 1145-46 (11th Cir. 2004). As the Eleventh Circuit has explained:

> There is a difference between an investigative stop of limited duration for which reasonable suspicion is enough, and a detention that amounts to an arrest for which probable cause is required. The difference is one of extent, with the line of demarcation resulting from the weighing of a "limited violation of individual privacy involved against the opposing interests in crime prevention and detection and in the police officer's safety." *Dunaway v. New York*, 442 U.S. 200, 209, 99 S. Ct. 2248, 2255, 60 L.Ed.2d 824 (1979); *see also United States v. Puglisi*, 723 F.2d 779, 785 (11th Cir. 1984).

*Id.*

In distinguishing a true investigative stop from a *de facto* arrest, a court must not adhere to "rigid time limitations" or "bright line rules," but must use "common sense and ordinary human experience." *United States v. Hardy*, 855 F.2d 753, 759 (11th Cir. 1988) (quoting *United States v. Sharpe*, 470 U.S. 675, 685 (1985)); *see United States v. Gil*, 204 F.3d 1347, 1350 (11th Cir. 2000); *United States v. Blackman*,

66 F.3d 1572, 1576 (11th Cir. 1995); *United States v. Hastamorir*, 881 F.2d 1551, 1556 (11th Cir. 1989). The factors that should be considered in distinguishing an investigative stop from an arrest include "the law enforcement purposes served by the detention, the diligence with which the police pursue the investigation, the scope and intrusiveness of the detention, and the duration of the detention." *Hardy*, 855 F.2d at 759; *see also Sharpe*, 470 U.S. at 685-686; *Acosta*, 363 F.3d at 1146. An investigatory stop does not become an arrest merely because a reasonable person would believe he was not free to leave; indeed, even handcuffing a suspect, by itself, does not automatically convert an investigative stop into an arrest. *United States v. Kapperman*, 764 F.2d 786, 791 n.4 (11th Cir. 1985); *see also Blackman*, 66 F.3d at 1576; *Hastamorir*, 881 F.2d at 1557.

Based on the totality of the circumstances in this case and the factors listed in *Hardy*, the Court finds that the Government has established that Officer Uhler lawfully stopped the vehicle on a reasonable suspicion that the driver of the vehicle had committed two traffic violations: having an improper window tint and failing to use his turn signal. Furthermore, the undersigned also finds that, although the Defendants were handcuffed and placed in the back of patrol cars during the search of the vehicle, the detention was of a reasonable duration for the purpose of

investigating and the detention was not so long as to be transformed into a *de facto* arrest. *See United States v. Gil*, 204 F.3d 1347, 1350 (11th Cir. 2000) (handcuffing female defendant and detaining her in patrol car for seventy-five minutes was not unreasonable because there was no female officer available to search her for weapons); *United States v. Hardy*, 855 F.2d 753, 761 (11th Cir. 1988) (a detention that lasted approximately fifty minutes was not too long to convert a *Terry* stop into an arrest). *Cf.* United States v. Place, 462 U.S. 696 (1983) (while declining to make bright-line rule, airport detention exceeding ninety minutes was unreasonable); *United States v. Puglisi*, 723 F.2d 779, 790 (11th Cir. 1984) (airport detention exceeding one hundred forty minutes was unreasonable).

Indeed, Defendants do not appear to challenge the lawfulness of the initial stop of the vehicle or the detention. Defendants argue, however, that the K-9 search of the vehicle was unlawful because it was not supported by probable cause.

B.    *Defendant Santos Had No Expectation of Privacy in the Truck*

To prevail on a claim that evidence was seized in violation of his Fourth Amendment rights, a defendant first bears the burden of demonstrating his legitimate and reasonable expectation of privacy in the areas searched. *United States v. Cooper*,

133 F.3d 1394, 1398 (11th Cir. 1998) (the individual challenging the search has the burden of both proof and persuasion); *see also Rakas v. Illinois*, 439 U.S. 128, 130 n.1 (1978); *United States v. Baron-Mantilla*, 743 F.2d 868, 869 (11th Cir. 1984). If a defendant successfully establishes a reasonable expectation of privacy, the burden then shifts to the government to prove that the search was reasonable based upon a recognized exception to the warrant requirement. *United States v. Bachner*, 706 F.2d 1121, 1125-26 (11th Cir. 1983).

A person has a legitimate expectation of privacy if (1) he has a subjective expectation of privacy, and (2) society is prepared to recognize that expectation as objectively reasonable. *United States v. Segura-Baltazar*, 448 F.3d 1281, 1286 (11th Cir. 2006). "A legitimate expectation of privacy [must] be proven by factors beyond mere possession, such as a right to exclude or a right to privacy." *United States v. Espinosa-Orlando*, 704 F.2d 507, 512 (11th Cir. 1983) (*citing Rakas v. Illinois*, 439 U.S. 128, 143-44 (1978)). The legitimacy of a defendant's privacy interest is determined by the totality of circumstances surrounding the defendant's relationship with the place or item searched. *Baron-Mantilla*, 743 F.2d at 870; *see also Rakas*, 439 U.S. at 152 ("The ultimate question . . . is whether one's claim to privacy from governmental intrusion is reasonable in light of all the surrounding circumstances.").

In the instant action, the Government does not dispute that Defendant Hill, as the driver and owner of the pickup truck, had a reasonable expectation of privacy as to the truck and any items found in it. Accordingly, the Court finds that Defendant Hill had a legitimate and reasonable expectation of privacy as to the items found in the truck. The Government argues, however, that Defendant Santos, as the passenger in the vehicle, has no standing to challenge the lawfulness of the K-9 search because he did not have a reasonable expectation of privacy with respect to the truck. The undersigned agrees.

The Supreme Court has held that a passenger in an automobile, who has no ownership or possessory interest in the automobile, does not have a legitimate expectation of privacy in the interior of the automobile because he does not have the right to exclude others from the car. *Rakas*, 439 U.S. at 140, 143 n.12; *United States v. Harris*, 526 F.3d 1334, 1338 (11th Cir. 2008) (*per curiam*); *see also United States v. Cooper*, 133 F.3d 1394, 1398 (11th Cir. 1998) ("A passenger usually lacks a privacy interest in a vehicle that the passenger neither owns nor rents, regardless of whether the driver owns or rents it.").

Defendant Santos nevertheless argues that he has standing to "challenge the constitutionality of a traffic stop" as a passenger in the vehicle that was stopped. Def.

Santos Br. [78] at 5. While that may be true, as discussed above, the undersigned has concluded that the initial stop of the vehicle was lawful, and the brief detention of both Defendants was also a lawful *Terry* stop that did not ripen into a *de facto* arrest. Defendant Santos offers no argument as to why he had a reasonable and legitimate expectation of privacy that would allow him to object to the lawfulness of the search of the pickup truck and to move to suppress the evidence found in the truck. The undersigned finds that, as a passenger in the vehicle with no ownership or possessory interest, Defendant Santos had no reasonable expectation of privacy in the truck, and thus, he may not suppress any evidence discovered during the K-9 search.

It is undisputed, however, that Defendant Hill had an expectation of privacy with respect to the pickup truck. He argues that the K-9 search of the truck was unlawful because it was unsupported by probable cause, and he requests that the evidence seized as a result of the K-9 search be suppressed. The undersigned finds that, contrary to Defendant's arguments, the initial search of the vehicle was conducted pursuant to a valid consent and the additional K-9 search was supported by probable cause.

C.     *Hill Consented to the Search of the Vehicle*

The Fourth Amendment protects people against unreasonable government searches and seizures that intrude on their reasonable expectations of privacy. U.S. Const. amend. IV; *Florida v. Jimeno*, 500 U.S. 248, 250 (1991); *United States v. Place*, 462 U.S. 696, 706-07 (1983). Accordingly, a search or seizure must normally be conducted under the authority of a court-issued warrant, supported by a finding of probable cause to believe that evidence of a crime will be found in the targeted location. *Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 619 (1989); *Mincey v. Arizona*, 437 U.S. 385, 390 (1978).

Warrantless searches are *per se* unreasonable under the Fourth Amendment, subject to only a few specifically established and well-delineated exceptions. *Payton v. New York*, 445 U.S. 573, 603 (1980); *Katz v. United States*, 389 U.S. 347 (1967). Because a warrantless search or seizure is presumptively invalid, the burden is ordinarily on the Government to establish by a preponderance of the evidence that a particular exception to the warrant requirement applies. *Lego v. Twomey*, 404 U.S. 477 (1972); *Vale v. Louisiana*, 399 U.S. 30, 34 (1970). Under the doctrine commonly known as the exclusionary rule, evidence is inadmissible if it is obtained through a search and seizure that is conducted without a warrant and is not subject to one of the

specific exceptions to the warrant requirement. *Mapp v. Ohio*, 367 U.S. 643, 655 (1961).

The Supreme Court has established that "[o]ne of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) (citations omitted). A search conducted pursuant to consent is not unreasonable so long as the consent is freely and voluntarily given. *Florida v. Royer*, 460 U.S. 491 (1983); *United States v. Tovar-Rico*, 61 F.3d 1529 (11th Cir. 1995). The Government bears the burden of proving that the consent was given freely and voluntarily. *Schnekloth*, 412 U.S. at 248-49. Consent may "not be coerced, by explicit or implicit means, by implied threat or covert force." *Id.* at 228. Whether a consent "was in fact voluntary or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." *Id.* at 227. Among the relevant circumstances that may be considered are the person's youth, lack of education or low intelligence; the lack of any warnings regarding the person's constitutional rights, and evidence of duress or coercion, such as deprivation of food or sleep and prolonged detention or questioning. *Id.* at 226. The Eleventh Circuit has also provided additional factors:

The determination as to whether a suspect's consent is voluntary is not susceptible to neat talismanic definitions; rather, the inquiry must be conducted on a case-by-case analysis. *Schneckloth v. Bustamonte*, 412 U.S. at 224-25, 93 S. Ct. at 2046. To assist the lower courts in making their determinations, this court has, on prior occasions, identified a non-exhaustive list of relevant factors to consider when making the assessment of whether consent to a warrantless search is voluntary: voluntariness of the defendant's custodial status, the presence of coercive police procedure, the extent and level of the defendant's cooperation with police, the defendant's awareness of his right to refuse to consent to the search, the defendant's education and intelligence, and, significantly, the defendant's belief that no incriminating evidence will be found. *United States v. Chemaly*, 741 F.2d at 1352 (quoting *United States v. Phillips*, 664 F.2d 971, 1023-24 (5th Cir. Unit B 1981) (footnotes omitted), *cert. denied*, 457 U.S. 1136, 102 S. Ct. 2965, 73 L.Ed.2d 1354 (1982)).

*United States v. Blake*, 888 F.2d 795, 798-99 (11th Cir. 1989).

In consideration of the *Schneckloth* factors, and the totality of the circumstances in this case, the undersigned finds that Defendant Hill was fully capable of giving a free, voluntary, and informed consent to search and that he did so on April 27, 2011, when he gave his consent to the officers to search the interior of the pickup truck. There is no evidence that Hill was so young, uneducated, or suffering from such a low intelligence that he was unable to understand the implications of granting consent to search. There is also no evidence that he was subjected to any mental or physical discomfort that would have forced him to give consent under duress.

The Supreme Court has recognized that certain encounters with law enforcement are so inherently coercive that a suspect who appears to be expressing consent may be merely "acquiescing to a claim of lawful authority," such that his apparent consent can not be termed voluntary. *Bumper v. North Carolina*, 391 U.S. 543, 548-49 (1968); *Fikes v. Alabama*, 352 U.S. 191 (1957). The threshold for showing "inherent coercion" is extremely high, however, and courts have found effective voluntary consent in cases in which suspects were faced with a far more intimidating show of force than was present in this case. *See*, *e.g.*, *United States v. Hidalgo*, 7 F.3d 1566 (11th Cir. 1993) (consent to search was voluntary although the defendant had just been arrested at gunpoint and had invoked his right to remain silent); *United States v. Garcia*, 890 F.2d 355 (11th Cir. 1989) (consent to search found voluntary after fourteen armed agents descended on suspect's house and, after being refused unlimited consent to search entire residence, threatened to return with a search warrant); *United States v. Long*, 866 F.2d 402 (11th Cir. 1989) (finding voluntary consent even after the police officers told homeowner that they would be back with a warrant and "dig the place up" if he refused permission to search).

Although the Court finds that Hill's consent to the search of the truck was freely and voluntarily given, Hill argues that he consented only to the human officers' search

of the car, and he contends that his consent did not extend to a K-9 search. The evidence in the record indicates that Hill gave his consent to search freely and without any limitations, and there is no evidence that he ever expressed any objection to the K-9 search in any way. Accordingly, the Court finds that his consent of the search of the vehicle was not limited only to humans. Nevertheless, even assuming that Hill's consent was limited to a search only by human officers and not K-9 officers, the Court finds that the K-9 search of the interior of the truck was lawful because it was supported by probable cause.

D.    *The K-9 Search Was Based on Probable Cause*

As discussed above, the Fourth Amendment protects against unreasonable police searches and seizures. *Florida v. Jimeno*, 500 U.S. 248, 250 (1991). The Supreme Court has emphasized that the Fourth Amendment protects only against *unreasonable* police intrusion into privacy, and accordingly, the touchstone of a court's inquiry must be whether, under the totality of the circumstances, the police acted reasonably in conducting a search. *See United States v. Chadwick*, 433 U.S. 1, 9 (1977) ("Our fundamental inquiry in considering Fourth Amendment issues is whether or not a search is reasonable under all the circumstances."), *overruled on other grounds by California v. Acevedo*, 500 U.S. 565 (1991); *accord Hill v.*

*California*, 401 U.S. 797, 803-04 (1971). To put it another way, the scope of an individual's Fourth Amendment rights against intrusion may not be measured in a vacuum, but must be considered in light of what information is reasonably available to police and in light of the magnitude of the intrusion. This point was made most emphatically in *Illinois v. Rodriguez*, 497 U.S. 177 (1990), in which the Supreme Court held that a good-faith, reasonable mistake as to the extent of an occupant's access to a home (and thus her right to consent to a search of the home) did not require suppression of the fruits of the search. As the Court stated in *Rodriguez*:

> It is apparent that in order to satisfy the "reasonableness" requirement of the Fourth Amendment, what is generally demanded of the many factual determinations that must regularly be made by agents of the government – whether the magistrate issuing a warrant, the police officer executing a warrant, or the police officer conducting a search or seizure under one of the exceptions to the warrant requirement – is not that they always be correct, but that they always be reasonable.

*Id.* at 185; *see also Hill*, 401 U.S. at 804 (when arrest was based on probable cause, but later turns out to be erroneous, evidence seized incident to that arrest is not subject to suppression so long as officers' decision to make arrest was "a reasonable response to the situation facing them at the time"). As *Rodriguez, Hill,* and their progeny make clear, a court may not apply hindsight to second-guess the reasonableness of a search

based on after-acquired information that could not have been known to police at the time.

Warrantless searches are nevertheless considered to be *per se* unreasonable under the Fourth Amendment, subject to only a few specifically established and well-delineated exceptions. *Payton v. New York*, 445 U.S. 573, 603 (1980); *Katz v. United States*, 389 U.S. 347 (1967). In addition to a valid consent, another well-established exception to the warrant requirement is the "automobile exception." The Supreme Court has held that, due to the mobility of vehicles, they may be searched without a warrant if the officers have probable cause to believe that the vehicle contains contraband or evidence of a crime. *Carroll v. United States*, 267 U.S. 132, 149 (1925). If probable cause exists to search an operational automobile, no additional exigent circumstances need be present in order to conduct a legal search of a vehicle without a warrant. *Maryland v. Dyson*, 527 U.S. 465, 466-467 (1999). Accordingly, the warrantless search of a vehicle has been held reasonable if supported by probable cause, even if the vehicle has been removed to the security of a police department lot. *United States v. Johns*, 469 U.S. 478 (1985)*; Chambers v. Maroney*, 399 U.S. 42 (1970). Finally, the right to conduct a warrantless search of a vehicle has been held

to extend to the search of any containers found within the vehicle that may conceal the subject of the search. *United States v. Ross*, 456 U.S. 798 (1982).

In this case, it is undisputed that the officers did not have a warrant to search Defendant Hill's pickup truck at the time they searched it and discovered the illegal narcotics and the handgun. It is also undisputed that Hill gave his consent to the officers to search the interior of the truck. Even if Hill's consent to search the truck did not extend to the K-9 search, as he argues, the seizure of the items found during the search was lawful under the automobile exception if the officers had probable cause to believe that the automobile contained contraband or evidence of a crime. *Ross*, 456 U.S. at 804-809. Probable cause to search "exists when, under the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be discovered in a particular place." *United States v. Mikell*, 102 F.3d 470, 475 (11th Cir. 1996). "[T]he nexus between the objects to be seized and the premises searched can be established from the particular circumstances involved and need not rest on direct observation." *United States v. Lockett*, 674 F.2d 843, 846 (11th Cir. 1982).

Probable cause may be found to search a particular area where law enforcement officers seek to search that location based on their common sense and experience as

to where persons selling drugs might conceal contraband. *See, e.g., Illinois v. Gates*, 462 U.S. 213, 230-231 (1983); *United States v. Jenkins*, 901 F. 2d 1075, 1081 (11th Cir. 1990). "The principal components of a determination of . . . probable cause will be the events which occurred leading up to the . . . search, and then the decision whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount . . . to probable cause." *Ornelas v. United States*, 517 U.S. 690, 696 (1996). The determination of probable cause also rests on the "the facts and circumstances within the *collective knowledge* of law enforcement officers, or of which they may have reasonably trustworthy information." *Craig v. Singletary*, 127 F.3d 1030, 1042 (11th Cir. 1997) (emphasis added).

The Court finds that, considering the collective knowledge of the officers involved in this investigation as discussed above, the officers had probable cause to believe that the truck may have contained illegal drugs or other evidence of drug trafficking. The officers detected a strong odor of marijuana coming from inside the truck, and Arna, the drug-trained dog of the K-9 unit also alerted to the presence of drugs after an open-air sniff. It is well settled that a drug-trained dog may conduct an open-air sniff without consent or probable cause. *See United States v. Place*, 462 U.S. 696, 707 (1983) (use of a "canine sniff" by a trained narcotics dog is not a search

within the meaning of the Fourth Amendment because it is much less intrusive than a typical search); *Hearn v. Bd. Pub. Educ.*, 191 F.3d 1329, 1332 (11th Cir. 1999) ("A dog sniff of a person's property located in a public place is not a search within the meaning of the Fourth Amendment."). Furthermore, "probable cause arises when a drug-trained canine alerts to drugs." *United States v. Tamari*, 454 F.3d 1259, 1265 (11th Cir. 2006) (quoting *United States v. Banks*, 3 F.3d 399, 402 (11th Cir. 1993)); *see also United States v. Dunkley*, 911 F.2d 522, 527 (11th Cir. 1990); *United States v. Puglisi*, 723 F.2d 779, 783 (11th Cir. 1984). For these reasons, the undersigned finds that the officers had sufficient reason to believe that there was a "fair probability" that illegal drugs were in the truck and thus, the K-9 search of the truck was supported by probable cause.

Defendant Hill argues, however, that the K-9 search was not supported by probable cause because the evidence indicates that the duffel bag that Officer Atzert had removed from the vehicle during the initial search was placed back into the vehicle at some point prior to Arna's search of the truck, and thus, the presence of the duffel bag in the truck somehow made Arna's alert to drugs in the vehicle "unreliable." The undersigned disagrees.

The evidence in the record indicates that when Officer Atzert conducted the initial search of the pickup truck, he detected a strong scent of marijuana and detected an especially strong odor coming from an empty brown duffel bag in the back seat of the truck. Finding of Fact ("FOF") 23-24. Officer Atzert also discovered small green leafy flakes inside the duffel bag, which he knew from his training and experience were remnants of marijuana. FOF 25. According to Officer Atzert, after he spoke to the Defendants about the bag, he placed the bag by his patrol car and did not return the bag to the vehicle at that time. FOF 29. Nevertheless, the evidence also indicates that, when Officer Sperl and Arna conducted the K-9 search of the vehicle, Arna alerted on the driver's side door, and when Officer Sperl opened the door of the truck and let Arna inside, she showed "immediate interest" in the duffel bag that was in the back seat of the vehicle. FOF 37-39. Thus, the evidence reflects that after Officer Atzert removed the duffel bag from the truck, one of the officers placed the bag back into the truck before Officer Sperl and Arna conducted the K-9 search. *See* FOF 36 and note 1.

Although Defendant Hill argues that the officers' decision to put the duffel bag back into the truck rendered Arna's alert "unreliable," the undersigned disagrees with that contention. First, the undisputed evidence is that Officer Atzert found the duffel

bag in the back seat of the truck during the initial search. Defendant Hill has cited no authority that would require the officers to remove the duffel bag from the vehicle before conducting the K-9 search, when the bag was already present in the vehicle. Second, the evidence indicates that, when conducting the open-air sniff of the truck, Arna alerted to the driver's side door by scratching her paws at the front seam of the door. FOF 37. Finally, the evidence also reflects that, upon Arna's alert on the duffel bag, Officer Sperl removed the bag from the vehicle and Arna alerted again on the front console. FOF 40-41. Thus, any "unreliability" of Arna's initial alert was cured by the removal of the bag. Even without the presence of the bag in the truck, Arna still alerted to the presence of drugs in the front console of the truck.

The Court finds, therefore, that the K-9 search of the pickup truck was conducted lawfully. First, Hill gave a valid and voluntary consent to the officers to search the truck, and did not limit his consent only to human officers. Second, upon the arrival of Officer Sperl and Arna, there is no evidence that Hill expressed any objection to the K-9 search or limited his consent in any way. Furthermore, even if Hill's consent to search the truck arguably did not extend to the K-9 search, the officers were lawfully permitted to conduct an open-air sniff without being required

to obtain Hill's consent, and Arna's alert to the presence of drugs in the vehicle supplied the probable cause to search the interior of the truck.

Accordingly, **IT IS RECOMMENDED** that the Defendants' Motions to Suppress Evidence [40][48] be **DENIED**.

### III.    Motions to Suppress Statements

Defendants have also filed Motions to Suppress Statements [72][77]. Defendants argue that the statements they made to Officer Atzert regarding the duffel bag should be suppressed because they made the statements before being advised of their right to remain silent, in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966). *See* FOF 26-28.[2]

In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court ruled that, because the custodial interrogation of arrested suspects in criminal cases is inherently coercive, statements made in response to such interrogation should be treated as presumptively coerced in violation of a defendant's Fifth Amendment rights. Thus, the Court held that a defendant's incriminating statements are not admissible as

---

[2] While Defendants filed generalized Motions to Suppress Statements, the only statements they addressed were those discussed in FOF 26 and 27, and those are the only statements addressed by this Report and Recommendation.

evidence against the defendant unless the defendant was advised before interrogation of his right to remain silent and his right to the presence of an attorney, including an appointed attorney if he was unable to afford one, and advised of the fact that anything he said could be used against him. *Miranda*, 384 U.S. at 478-79.

*Miranda* warnings are not required for all police encounters with citizens, however, but only when police interrogate a suspect who is in custody. *Rhode Island v. Innis*, 446 U.S. 291, 300 (1980). A suspect is said to be in custody only when "there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121 (1983) (*quoting Oregon v. Mathiason*, 429 U.S. 492, 495 (1977)); *see also United States v. Muegge*, 225 F.3d 1267, 1269-70 (11th Cir. 2000). Similarly, not all police questioning rises to the level of interrogation. "The term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Innis*, 446 U.S. at 301 (footnotes omitted).

To determine whether the government has violated a defendant's Fifth Amendment right against self-incrimination, courts focus on whether the defendant

was interrogated in police custody at the time the statements were made. In *Thompson v. Keohane*, 516 U.S. 99 (1995), the Supreme Court held that courts must look at the totality of the circumstances surrounding the interrogation to evaluate whether an individual was in custody for *Miranda* purposes. "Two discrete inquiries are essential to the determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson*, 516 U.S. at 112 (footnote omitted). As the Eleventh Circuit has explained:

> In order for a court to conclude that a suspect is in custody, it must be evident that, under the totality of the circumstances, a reasonable man in the suspect's position would feel a restraint on his freedom of movement fairly characterized as 'that degree associated with a formal arrest' to such extant that he would not feel free to leave. Under the objective standard, the reasonable person from whose perspective 'custody' is defined is a reasonable *innocent* person.

*Muegge*, 225 F.3d at 1270 (*quoting United States v. Phillips*, 812 F.2d 1355, 1360 (11th Cir. 1987) and *United States v. Moya*, 74 F.3d 1117, 1119 (11th Cir. 1996)) (citations omitted).

Significantly, the Supreme Court has held that ordinary traffic stops are generally considered "*Terry* stops," and so long as the detention is brief and the police

officer limits questioning of the suspect to the scope of the justification for the stop, *Miranda* warnings are not required. *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984) ("Typically, this means that the officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions."). In this case, as discussed above, the undersigned concludes that the investigatory *Terry* stop of the pickup truck was not so prolonged that it ripened into a *de facto* arrest. *See United States v. Kapperman*, 764 F.2d 786, 791 n.4 (11th Cir. 1985). Accordingly, the officers were permitted to ask limited questions related to the scope of the justification for the stop.

Officer Atzert, however, did not merely ask Defendants about the traffic violations that were the justification for the traffic stop. Instead, the evidence indicates that, upon discovering the duffel bag in the backseat of the truck that had a strong odor of marijuana, he asked the Defendants about the contents of the bag. Hill told him that the bag belonged to Santos, and when Santos was asked about the bag and whether it contained marijuana, he admitted that the bag was his and said there may have been marijuana in it previously, but there wasn't any inside the bag at that time. FOF 24-27.

Deciding when a suspect was taken into custody for *Miranda* purposes involves the consideration of several factors, including, among others, the location of the interview, the existence of any physical restraints such as handcuffs or drawn weapons, whether the suspect asked to leave, the officers' demeanor, the degree of pressure applied to the suspect, and whether the officers "brandished weapons, touched the suspect, or used language or a tone that indicated that compliance with the officers could be compelled." *United States v. Long*, 866 F.2d 402, 405 (11th Cir. 1985); *see also United States v. Luna-Encinas*, 603 F.3d 876, 881 (11th Cir. 2010)*; United States v. Street*, 472 F.3d 1298, 1309 (11th Cir. 2006).

In this case, consideration of those factors leads to the conclusion that Defendants were in custody at the time they made the statements at issue to Officer Atzert. First, the location of the initial interview was a traffic stop in a public parking lot at Church's Chicken. The Eleventh Circuit has held that "we are much 'less likely to find the circumstances custodial when the interrogation occurs in familiar or at least neutral surroundings, such as the suspect's home.'" *Luna-Encinas*, 603 F.3d at 882 (*quoting United States v. Brown*, 441 F.3d 1330, 1348 (11th Cir. 2006) (quotation marks, citation, and emphasis omitted). While a public parking lot is not a "familiar" location such as a suspect's home, Defendants were not being questioned at the police

station. *See United States v. Acosta*, 363 F.3d 1141, 1150 (11th Cir. 2004) ("The totality of the circumstances were such that a reasonable person in Acosta's position would not have believed that he was utterly at the mercy of the police, away from the protection of any public scrutiny, and had better confess or else. No *Miranda* warnings were required at the time.").

Nevertheless, the Defendants were both physically restrained in handcuffs and had been placed in the back of patrol cars, a factor which indicates that they certainly were not free to leave while the officers were conducting the search of the pickup truck. Indeed, not only were they not free to leave, they were physically restrained and unable to leave. Further, there were at least four officers and two dogs present; this was not a routine traffic stop. Although the officers did not draw their weapons on the Defendants, and the evidence indicates that they spoke in a normal tone of voice without making any threats, the undersigned concludes that the balance of the factors set forth in *Long* indicates that the Defendants were in custody at the time they made the statements at issue during the traffic stop of the vehicle.

Defendants argue that no reasonable person in their position would have felt free to leave; indeed, they were unable to leave because they were in handcuffs and sitting in the back of patrol cars, and thus, they argue that they were in custody for

*Miranda* purposes. The Eleventh Circuit has stated, however, that the "free to leave" test applies to determine whether a suspect has been "seized" under the Fourth Amendment, but not whether he is in "custody" for the purposes of *Miranda*.

> As some of our sister circuits have decided, a seizure does not necessarily constitute custody for *Miranda* purposes. The standards are different. The Fourth Amendment seizure analysis uses the "free to leave" test: a person is "seized" when "a reasonable person would [not] feel free to terminate the encounter" with the police. By contrast, a person is in "custody" for *Miranda* purposes only when there is a "formal arrest *or restraint on freedom of movement of the degree associated with a formal arrest*."

*Street*, 472 F.3d at 1309 (citations omitted, emphasis added).

Thus, the "critical factor" is not whether a reasonable person in the Defendants' position would have felt that he was free to leave at any time, but whether he would have felt that his freedom of movement had been restrained *to the degree associated with a formal arrest.* The Eleventh Circuit has held that the use of physical restraints on a suspect is a key factor in determining whether the defendant's freedom of movement was restricted to the degree associated with a formal arrest. *See United States v. Muegge*, 225 F.3d 1267, 1271 (11th Cir. 2000) (finding that the defendant was not in custody for *Miranda* purposes because "Muegge was interrogated in a secure facility but never placed under arrest or physically restrained in any significant

way"). In contrast, in this case, the Defendants' car was blocked, they were handcuffed and placed in separate police cars, and four officers were present. As discussed above, after consideration of all the factors set forth in *United States v. Long*, 866 F.2d 402, 405 (11th Cir. 1985), the undersigned finds that, based on the totality of the circumstances, Defendants were in custody because a reasonable person in their position, after having had his car blocked, confronted with an overwhelming show of force (four officers), removed from his car, restrained in handcuffs, and placed in the back seat of a patrol car, would have believed that his freedom was being restrained to the degree associated with a formal arrest.

In addition, because Officer Atzert questioned the Defendants about the duffel bag found in the back seat of the truck, which was beyond the scope of the reason for the initial traffic stop, the undersigned also finds that his questions to them would be considered "interrogation" because his questions about the duffel bag were reasonably likely to elicit incriminating responses. *See Rhode Island v. Innis*, 446 U.S. 291, 301 (1980). For these reasons, the Defendants' statements to Officer Atzert in response to the questions about the duffel bag must be suppressed because the statements were made while the Defendants were in custody and were being interrogated, but before they were advised of their *Miranda* warnings.

Accordingly, the undersigned **RECOMMENDS** that Defendants' Motions to Suppress Statements [72][77] be **GRANTED**.

**RECOMMENDATION**

For the above reasons, **IT IS RECOMMENDED** that  the Motion to Suppress Evidence filed by Defendant Hill [40] and the Motion to Suppress Evidence filed by Defendant Santos [48] be **DENIED**.

**IT IS FURTHER RECOMMENDED** that the Motion to Suppress Statements filed by Defendant Hill [72], and the Motion to Suppress Statements filed by Defendant Santos [77] be **GRANTED**.

In addition, the Consent Motion to Extend Deadline for Filing Post Hearing Briefs [76] filed by Defendant Santos is **GRANTED** as unopposed.

**IT IS SO RECOMMENDED** this 24th day of April, 2012.

_____
C. CHRISTOPHER HAGY
UNITED STATES MAGISTRATE JUDGE